**UNITED STATES of America**

v.

**Lee ALEXANDER, Defendant.**

**No. 87–CR–137.**

United States District Court,
N.D. New York.

Sept. 6, 1989.

Frederick J. Scullin, Jr., U.S. Atty., N.D. N.Y., Syracuse, N.Y. (Paula Ryan Conan, of counsel), for U.S.

Boreanaz, Baker & Human, Buffalo, N.Y., and James R. McGraw, Syracuse, N.Y. (Harold J. Boreanaz, of counsel), for defendant.

## MEMORANDUM-DECISION AND ORDER

McAVOY, District Judge.

Following remand from the Second Circuit, reversing this court's order denying the government's motion for specific performance of that portion of defendant's plea agreement relating to surrender of assets and directing the court to hold "whatever proceedings may be necessary to determine what the parties to this agreement intended, whether a breach occurred, whether specific performance is an appro-priate remedy here, and if so, what specifically should be required of defendant and his attorneys," *United States v. Alexander*, 869 F.2d 91, 96 (1989), this court finds that defendant breached the plea agreement and orders that the assets in dispute used by defendant as partial payment for services rendered by his attorneys be surrendered to the government.

*Background*

Lee Alexander, formerly the mayor of Syracuse, New York, was indicted in 1987 for violating and conspiring to violate the Racketeer Influenced and Corrupt Organization Act (RICO), for violating the Hobbs Act, for conspiring to defraud the United States and for income tax evasion. The forty-count indictment also included a claim for forfeiture of Alexander's assets pursuant to 18 U.S.C. § 1963.

Ultimately, after some two months of serious negotiations, Alexander, represented by counsel (Harold J. Boreanaz and James R. McGraw), reached an agreement with the government on January 4, 1988 and two days later pled guilty to one count of violating RICO, one count of conspiracy to defraud the government and one count of income tax evasion. Specifically, the government agreed (1) that the sentences imposed would be served concurrently, (2) that no sentence would exceed 10 years' imprisonment, (3) that fines would not exceed $100,000 and (4) that the government would move to dismiss thirty-seven counts of the indictment, including the claim for forfeiture. For his part, Alexander agreed (1) to plead guilty to three counts of the indictment and to admit facts sufficient to convict him of those charges, (2) to fully disclose his assets and to submit a financial statement in this regard (Plea Agreement, ¶ 9a), (3) to represent that such disclosure and financial statement is complete and truthful (¶ 9b), (4) to provide satisfactory verification to the government that he has no hidden assets which he has not disclosed (¶ 9c), (5) to surrender to the United States, prior to sentence, "all assets, including cash, municipal bonds, and past due interest coupons" (¶ 9d), and (6) to "surrender and relinquish any and all claims to the

assets identified in the Schedule of Assets which is attached hereto and hereby incorporated by reference," (¶ 9e). The Schedule of Assets (referred to above) provided as follows:

I. Assets in the possession of and under the dominion and control of the defendant Lee Alexander which are to be surrendered to the government ...:

A. All currency, acquired or derived directly or indirectly from the underlying offense, (totalling at least $120,000.00);

B. All municipal bearer bonds, acquired directly or indirectly through the underlying offense, (having a face value of approximately $500,000.00), subject to [certain] exceptions ...; and

C. All matured interest coupons, acquired directly or indirectly through the underlying offense, (approximately $110,-000.00).

D. Precious coins, if any.

II. Assets in the possession of and under the dominion and control of the United States recovered during the course of the investigation to which the defendant Lee Alexander relinquishes any and all claims pursuant to this agreement:

A. Municipal bearer bonds having a face value of approximately $425,000.00 recovered from Christ Lemonides, Gregory D. Ferentino, and James T. Spaulding.

III. Assets in the possession and under the dominion and control of the United States recovered during the course of the investigation to which the defendant Lee Alexander relinquishes any and all claims and which will be disposed of by the United States in accordance with paragraph 14(b) of the plea agreement:

A. $20,000.00 in cash recovered from Marine Midland safe deposit box # 1088 on August 20, 1986;

B. Municipal bearer bonds having a face value of approximately $40,000.00 recovered from Flagship Securities, Inc.; and

C. Three gold coins recovered from James T. Spaulding and Michael Elliot.

Concluding the plea agreement, paragraph 16 states that "[i]t is understood by the parties to this Agreement that the terms and conditions specified therein constitute the full and complete understanding between them, and that any modifications, deletions or additions must be in writing."

Even before the agreement was reached, the government had recovered $465,478 of Alexander's assets to which, under the subsequently executed plea agreement, Alexander relinquished all claim. After the plea agreement was reached, but before sentencing, the government recovered an additional $851,697 in bonds and coupons and $125,000 in cash, bringing the total recovered by the government before sentencing to $1,442,175.

On March 24, 1988, the day set for sentencing, the government asserted that Alexander had not fully complied with the plea agreement in that he had not fully disclosed his assets and had failed to surrender all of the assets he had agreed to surrender. The government was aware of coins worth approximately $20,000 to $30,-000 and other assets totalling $79,923.42 that had been in Alexander's possession or control but which had not been surrendered. Specifically, these unsurrendered assets included (a) three checks: one for $32,242.84, one for $10,000 and one for $34,980.58, (b) $2,700 in cash and (c) 21 gold coins and 100 silver dollars. Between execution of the plea agreement and the time of sentencing Alexander's attorneys recovered these funds from overseas bank accounts and safe deposit boxes and kept two of the checks, the cash and the coins as payment of attorneys' fees. (The cash was thereafter spent and the $34,980.58 check was sent, at Alexander's direction, to New York State in payment of New York State tax liabilities.)

After enumerating the unsurrendered assets that the government claimed it was entitled to, the United States Attorney moved for an order of specific performance that would require Alexander or his attorneys to turn over the withheld assets. Alexander's attorneys argued that the assets in dispute were no longer in Alexander's possession or control and that those assets that had been paid to the attorneys were exempt from forfeiture as attorneys' fees.

The court reserved decision on the motion but ordered that the two remaining checks and the coins be placed in an escrow account.

Sentencing went forward as all had agreed and thereafter the government renewed its motion for specific performance which this court denied on the ground that specific performance of a plea agreement is not a remedy available to the government upon a defendant's breach. The Second Circuit reversed, holding that when a defendant breaches his plea agreement specific performance is available to the government as a possible remedy. 869 F.2d at 93–94. Recognizing, to a certain extent at least, the applicability of contract law principles to plea agreements, the Second Circuit remanded the matter to this court for further proceedings to determine what the parties to this plea agreement reasonably understood to be the terms of the agreement, *United States v. Carbone*, 739 F.2d 45, 46 (2d Cir.1984); *Paradiso v. United States*, 689 F.2d 28, 31 (2d Cir.1982) (per curiam), *cert. denied* 459 U.S. 1116, 103 S.Ct. 752, 74 L.Ed.2d 970 (1983), including whether or not the parties intended the agreement to exempt attorneys' fees from those assets that were to be surrendered, whether a breach occurred, whether specific performance, although the only remedy remaining to the government, is appropriate here and, if so, what specifically should be required of defendant and his attorneys. 869 F.2d at 94–96.

This court held a hearing on June 20, 1989 with respect to which pre- and post-hearing submissions were filed: although cognizant of the Second Circuit's opinion, the submissions filed on behalf of Alexander were limited to the argument that, under the circumstances here, specific performance is not an appropriate remedy and should be denied; alternatively, defendant's counsel asked the court to fashion an equitable remedy to adequately compensate counsel for the reasonable value of the legal services rendered. *See* James R. McGraw's Post–Hearing Memorandum of Law (unpaginated); *see also* Pre–Hearing Argument and Affidavit of Harold J. Boreanaz. It would seem, on the basis of defendant's pre- and post-hearing submissions, that defendant has implicitly conceded that there was no understanding reached permitting reservation of assets for attorneys' fees and that the reservation of assets here constituted a breach of defendant's obligations under the plea agreement. Nevertheless, given that there has not been an express concession on these issues, under the circumstances, the court will undertake the appropriate analysis as set forth in the Second Circuit's opinion.

*Discussion*

Following the Supreme Court's decision in *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), federal courts have developed a "common law" of plea agreements around the notion that, because the negotiated guilty plea represents a bargained-for quid pro quo, it is contractual in nature and is therefore subject to interpretation under principles of contract law. *See United States v. Ataya*, 864 F.2d 1324, 1329–1337 (7th Cir.1988); *United States v. Partida–Parra*, 859 F.2d 629, 633 (9th Cir.1988); *United States v. Papaleo*, 853 F.2d 16, 19 (1st Cir.1988); *United States v. Read*, 778 F.2d 1437, 1441 (9th Cir.1985), *cert. denied* 479 U.S. 835, 107 S.Ct. 131, 93 L.Ed.2d 75 (1986). Although it is unclear to what extent the specifics of contract law govern disputes relating to plea agreements, at least two general principles can be discerned: (1) that resolution of disputes over the terms of the agreement or allegations regarding breaches thereof necessitates inquiry into what the parties to the plea agreement reasonably understood to be the terms of that agreement and (2) that a court is to apply an objective standard in making its factual determination as to what the parties' reasonable understanding was. *See United States v. Alexander*, 869 F.2d at 95; *United States v. Partida–Parra*, 859 F.2d at 633; *United States v. Read*, 778 F.2d at 1441; *Paradiso v. United States*, 689 F.2d at 31; *United States v. Arnett*, 628 F.2d 1162, 1164 (9th Cir.1979). Application of the foregoing principles leads the court to the conclusion that the attorneys for Lee Alexander should have

known that they would not be permitted to reserve from the assets to be surrendered money to pay Alexander's attorneys' fees, i.e., that defendant's counsel should have known, as was reasonably to be expected by the government, that all of Alexander's assets related directly or indirectly to his underlying offenses would have to be surrendered to the government for disposal in accordance with the provisions of the plea agreement without exception for any payment of attorneys' fees.

The starting point for the court are the pertinent provisions of the plea agreement. Specifically, paragraph 9d read in conjunction with part I. of the Schedule of Assets, see *United States v. Ataya,* 864 F.2d at 1335; *United States v. Irvine,* 756 F.2d 708, 710 (9th Cir.1985), required Alexander to surrender to the government all currency, municipal bearer bonds and matured interest coupons in his possession or under his dominion and control, subject to certain enumerated exceptions, related directly or indirectly to his underlying offense and also required Alexander to surrender all precious coins in his possession or under his dominion and control. In the court's view, these requirements are unambiguous; moreover, as all concede, no reference is made in paragraph 9, the Schedule of Assets, in the provisions of the plea agreement relating to disposal of assets (¶ 14) or in any other provision of the agreement to reservation of assets for payment of attorneys' fees or to recovery by the government of the proceeds of any sale of assets being made subject to an outstanding attorney's retainer lien, as had been the case with co-defendant Christ Lemonides. *See* Government's Exhibit 6A and 6B. Nevertheless, although the unambiguous provisions of the plea agreement require, in essence, that all assets related to the underlying offense be surrendered to the government for disposal by it and although no reference is made to the payment of attorneys' fees, or perhaps because of the absence of any such reference, the court must go behind the literal terms of the plea agreement to ascertain what the parties reasonably understood these terms to mean, objectively viewed.

In this regard, the court notes that, during the course of "serious" plea negotiations involving defendant, his two attorneys, United States Attorney Frederick J. Scullin, Jr., AUSA Joseph Pavone and Strike Force attorney Greg West, the issue of exempting certain assets held by Alexander had been broached, with the government ultimately agreeing to exempt from the overall requirement of surrender Alexander's marital residence and personal belongings, such as clothing, jewelry and furniture. This informal understanding, characterized as a "Gentlemen's Agreement" during the June 20 hearing, although referred to in the first draft of the plea agreement, *see* Government's Exh 5, did not find its way into the final plea agreement. This informal understanding to exempt certain assets was reached notwithstanding the parties' understanding that one of the purposes of the assets surrender provisions of the plea agreement was to leave Alexander with as few assets as possible. Informal agreements were also reached relating to the government's role in prison selection and to Alexander's voluntary commitment to prison; no other informal agreements were reached, however, and, more particularly, defendant's attorneys concede that, in view of the government refusing even to discuss the issue regarding reservation of assets for the payment of attorneys' fees raised by them, perhaps twice, during the final stages of negotiations in and around late December 1987, no agreement of any kind was reached relating to the payment of fees. Nevertheless, defendants' attorneys (through the testimony of Harold Boreanaz) took the government's refusal to discuss the attorneys' fees issue as indicating simply the government's unwillingness to include any reference to the payment of attorneys' fees in the final plea agreement holding open the possibility, in their view, that the payment of attorneys' fees could be subject to further discussions, given that the government had to be aware that they had received some payment already and expected to be paid additional sums for services rendered. Even so, no further dis-

cussions relating to the payment of attorneys' fees from surrendered assets took place and defendants' attorneys failed to explain what if anything the government did to induce the belief that further discussions regarding attorneys' fees would occur. More to the point, defendants' attorneys failed to adduce any proof relating to acts done or statements made by the government that would induce any belief that assets could be withheld to pay attorneys' fees. It follows then that the argument of Harold Boreanaz that he would not have gone, at Alexander's direction, to Nassau and Panama to recover the assets now in dispute if he did not expect that he would be able to reserve some of those assets for attorneys' fees must be rejected. That, as Harold Boreanaz testified, the parties had different perceptions regarding attorneys' fees does not, given the foregoing, mean that the perception of defendant's counsel was reasonable.

Viewed objectively, the parties' reasonable understanding of the terms of the plea agreement was or should have been that the government wanted to leave Alexander with as few assets as possible, that all the assets subject to surrender were to be surrendered to the government for disposal by it and that no exception was to be made for payment of attorneys' fees. Clearly, had the government wanted to accommodate defendant's counsel on the issue of attorneys' fees, it could have done so as it did with co-defendant Christ Lemonides. There is simply no evidence in the record to support the view that the parties reasonably understood reservation of assets for the payment of attorneys' fees to be a term of the plea agreement or to be otherwise permissible. Having so concluded, the court's attention now turns to determining whether defendant breached the terms of the plea agreement.

■ Whether defendant breached the terms of the plea agreement such that appropriate action is required by the court, which the government bears the burden of proving by a preponderance of the evidence, *see United States v. Ataya*, 864 F.2d at 1337, rests in part on determining whether the unsurrendered assets, recovered by Harold Boreanaz between the time the plea agreement had been executed and the time for sentencing, are related, directly or indirectly, to the underlying offense. As an initial matter, as noted by the Second Circuit, the government has complied substantially with its part of the bargain; moreover, there is no question, in the court's view, that defendant did not fully and truthfully disclose to the government all of his assets as was required by paragraphs 9a, 9b and 9c of the plea agreement. As for the remaining issue, it is not seriously contested, if at all, by defendant's counsel that the unsurrendered assets were related to the underlying offense: Harold Boreanaz, in travelling at Alexander's direction to Panama and the Bahamas to recover funds remaining there, proceeded under belief, determined by this court to have been unreasonable, that defendant's counsel could withhold from assets subject to surrender to the government a portion for the payment of attorneys' fees. Moreover, on the basis of materials submitted to the court in connection with this hearing (i.e., a stipulation entered into by counsel after the June 20 hearing and that portion of defendant's April 7, 1989 Grand Jury testimony subsequently received into evidence over the objection of defendant's counsel and reviewed by the court in chambers (Government's Exh 2)) relating to the circumstances surrounding the establishment of the Panamanian and Bahamian bank accounts and to Alexander's March 1988 Grand Jury testimony regarding the source of the assets in the original Panamanian account, *see* Post–Hearing Stipulation, the reasonable inference can be drawn that substantially all, if not all, of the assets kept by defendant in Panama and Nassau were related, directly or indirectly, to the kickback/extortion scheme.

Accordingly, the court concludes that the government has established, by a preponderance of the credible evidence, a substantial breach of the terms of the plea agreement. Remaining for the court's determination is whether specific performance is an appropriate remedy here.

Specific performance, as an equitable remedy, requires some attention to the relative benefits and burdens that the parties to the breached agreement may enjoy or suffer as compared with an available legal remedy. *Texas v. New Mexico,* 482 U.S. 124, 107 S.Ct. 2279, 2285, 96 L.Ed.2d 105 (1987). Specific performance, even though—as noted by the Second Circuit in the present case—it is the only remaining remedy available to the government, *see* 869 F.2d at 95, is not demandable as a matter of absolute right; rather, the remedy rests entirely in the court's discretion which is to be exercised according to settled principles of equity with reference to the facts of the particular case. *Texas v. New Mexico,* 107 S.Ct. at 2285; *Haffner v. Dobrinski,* 215 U.S. 446, 450, 30 S.Ct. 172, 173, 54 L.Ed. 277 (1910). That is to say, specific performance may not and will not be ordered if under all the circumstances it would be inequitable to do so, *Wesley v. Eells,* 177 U.S. 370, 376, 20 S.Ct. 661, 664, 44 L.Ed. 810 (1900), as where the effect would be disproportionate in its harm to the breaching party and its assistance to the non-breaching party, *see Van Wagner Advertising Corp. v. S & M Enterprises,* 67 N.Y.2d 186, 195, 501 N.Y.S.2d 628, 633, 492 N.E.2d 756, 761 (1986).

In the present case, defendant's counsel argue, essentially, that granting the government's motion for specific performance would be unfair to them, given that they did a substantial amount of work identifying and retrieving defendant's assets which provided a great benefit to the government and for which they deserve to be paid. They also note that the fees in question are less than would be allowed to assigned counsel, that the government has already made a substantial recovery under the plea agreement and has recovered more than it initially sought and that granting the government's motion here may have a chilling effect on criminal defendants' rights in the future. For its part, the government argues that its proven "damages" exceed the relief it is seeking here in that the government is not seeking to recover either the amount of the check paid to New York State or the cash that has already been spent and that Alexander is not entirely without assets with which to pay his attorneys (a point not disputed by Mr. Boreanaz or Mr. McGraw), *see* Government's Post–Hearing Memorandum at 6 n. 5.

Application of the above-stated principals, in view of the parties' arguments, convinces the court that specific performance to the extent sought by the government—essentially the payment of money—is warranted here. That, as defendant's counsel point out, the government has already recovered a substantial sum of money, perhaps exceeding what it initially hoped to recover, does not warrant the conclusion that the government is seeking specific performance of the plea agreement with "unclean hands" or in bad faith or that recovery of these additional sums of money is somehow inequitable. The court can discern no hardship, let alone any undue hardship, to the defendant or to his counsel if the defendant is ordered to surrender to the government that which should have been surrendered in the first place. Supervening events have not rendered the terms of the plea agreement so one-sided as to make defendant's performance under that agreement unconscionable; nor has the court been made aware of any significant increase in the value of some of the assets to be surrendered (i.e., the precious coins) such that an undeserving benefit would be conferred on the government. To the extent that consideration of the public interest or of public policy is appropriate, *see United States v. Johnson,* 861 F.2d 510, 512 (8th Cir.1988), the court can discern no adverse impact on the public interest or on public policy arising out of ordering the defendant to comply with the provisions of his plea agreement. More to the point, the concerns expressed regarding the impact specific performance would or may have on future criminal defendants' Sixth Amendment rights have, in the court's view, been rendered meritless in light of the Supreme Court's decisions in *United States v. Monsanto,* — U.S. —, 109 S.Ct. 2657, 2665–2667, 105 L.Ed.2d 512 (1989); *Caplin & Drysdale, Chartered v.*

*United States,* —— U.S. ——, 109 S.Ct. 2646, 2651–2657, 105 L.Ed.2d 528 (1989). Moreover, in view of these two cases it is difficult, if not impossible, for the court to see how ordering surrender of the withheld assets would be unfair to Alexander or to his attorneys. *See United States v. Monsanto,* 109 S.Ct. at 2665–2667; *Caplin & Drysdale, Chartered v. United States,* 109 S.Ct. at 2656–2657 and 2656 n. 10 (recognizing that criminal defense lawyers may very well be unable to collect their fees upon conviction or because of the terms of a plea agreement).

In sum, the court concludes, in the exercise of its discretion, that specific performance is an appropriate remedy under the circumstances of this case and orders defendant's counsel to surrender to the government forthwith the two checks (in the amounts of $32,242.84 and $10,000) currently being held in escrow for disposal, along with the 121 precious coins being held by the government, in accordance with the provisions of the plea agreement.

*Conclusion*

Following remand from the Second Circuit, the court, having conducted necessary proceedings, grants the government's motion for specific performance and orders the surrender of assets for disposal as set out above.

IT IS SO ORDERED.