**NEMER JEEP–EAGLE, INC.,**
**Plaintiff–Appellant,**

v.

**JEEP–EAGLE SALES CORPORATION,**
**Defendant–Appellee.**

**No. 758, Docket 92–9081.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 14, 1992.
Decided April 28, 1993.

Francis V. Imbornone, New York City (Snow Becker Krauss P.C., of counsel), for plaintiff-appellant Nemer Jeep–Eagle, Inc.

Thomas S. Wiswall, Buffalo, NY (Phillips, Lytle, Hitchcock, Blaine & Huber, of counsel), for defendant-appellee Jeep–Eagle Sales Corp.

Before: CARDAMONE and PRATT, Circuit Judges, and LASKER, District Judge *.

CARDAMONE, Circuit Judge:

An automobile dealer appeals from the denial of injunctive relief it sought when the manufacturer whose line of autos it sold granted additional dealerships in its market area. In declining to grant injunctive relief, the district court quite naturally applied the familiar rules used to determine when a preliminary injunction should issue. But because of the contractual relationship between the parties, the dealer's motion should have been tested instead under those principles that govern when specific performance of a contract should be ordered. Although both standards involve equitable principles and contain common elements, they are different. R. Frost's journeyer, after choosing "The Road Not Taken," darkly observed, "[a]nd that has made all the difference." Robert Frost, *You Come Too* 84 (5th ed. 1962). Here too the district court took a less travelled road, which made all the difference in the result it reached. Taking the wrong legal path led it to the wrong destination.

In April 1990 brothers Robert and Peter Nemer signed a franchise agreement with auto manufacturer Chrysler Corporation's subsidiary, Jeep–Eagle Sales Corp. (Eagle Sales or appellee). The contract gave the Nemers the right to operate a Jeep–Eagle automobile dealership, Nemer Jeep–Eagle, Inc. (Nemer or appellant) in Latham, near Albany, New York. The Nemers' right to sell Jeep–Eagle automobiles was nonexclusive, and in July 1992 Eagle Sales approved four new Jeep–Eagle dealerships in the Albany market area. According to the Nemers, this has placed their business in peril. The parties agreed to arbitrate the legality of awarding the new franchises, so that question is not before us. Instead, we must decide whether Nemer is entitled to an injunction stopping the implementation of these new franchises and maintaining the *status quo* in the marketplace until arbitration is complete. Two orders of the United States District Court for the Northern District of New York (Cholakis, J.) denied Nemer such injunctive relief.

## BACKGROUND

The parties' franchise agreement, a "Term Sales and Service Agreement" form drafted by Eagle Sales, was executed on April 5, 1990. Originally set to expire on October 5, 1991, the contract was extended on January 30, 1992 and remains in effect. As part of the franchise relationship, Nemer continually must attain certain performance goals, such as the sale of 469 automobiles annually. The agreement also requires the dealer to construct a new facility to showcase Jeep–Eagle automobiles. After investing more than $500,000 toward meeting those objectives, Nemer's business began to show a profit in May 1992.

* Hon. Morris E. Lasker, Senior Judge, United States District Court for the Southern District of New York, sitting by designation.

Although the contract acknowledges a "mutuality of interests" between the automobile dealer and the automobile manufacturer, it also states that Nemer's franchise is "nonexclusive." According to the contract, appellant's "Sales Locality may be shared with other [Jeep–Eagle] dealers of the same line-make as [appellee] determines to be appropriate." Central to the appeal before us is Paragraph 7 of the contract, which requires arbitration of "[a]ny and all disputes" arising under its terms after either party has provided "written notification." Paragraph 7 further states that

> [i]f the arbitration provision is invoked when the dispute between the parties is ... the legality of ... adding a new [Jeep–Eagle] dealer of the same line-make ... [Eagle Sales] will stay the implementation of the decision to ... add such new [Jeep–Eagle] dealer ... until the decision of the arbitrator has been announced....

The contract also requires that federal law, 9 U.S.C. §§ 1–14 (1988 & Supp.III 1991), govern arbitration proceedings.

In February 1992 an executive for Eagle Sales and Chrysler, Charles T. Polce, told Nemer that the manufacturer had adopted a marketing strategy of combining Jeep–Eagle and Chrysler franchises. In keeping with this strategy, Polce said, Eagle Sales was reviewing Jeep franchise applications from four Chrysler dealerships located between six and 20 miles from Nemer's site. Three Jeep–Eagle dealerships, including Nemer, already shared the Albany market. Robert Nemer contends that Polce delivered an implied ultimatum when he was told that he would be the "loser" in the new marketing strategy were he not to buy a Chrysler dealership. Appellant subsequently tried to purchase one of two nearby Chrysler dealerships. Despite conducting negotiations throughout the spring, first with Goldstein Chrysler–Plymouth in Latham and then with Izzo Chrysler–Plymouth in nearby Mechanicville, Nemer did not buy a Chrysler dealership.

Eagle Sales went forward with its marketing strategy. In a letter dated July 14, 1992 Polce told Nemer that Chrysler was "ready to approve" the new Jeep–Eagle franchises but would delay approval until July 20 "in order to allow you additional time to conclude your negotiations to purchase Izzo Chrysler–Plymouth and relocate Jeep–Eagle to Mechanicville." Less than one week later, on July 20, Chrysler granted the new franchises. Appellant claims that it was not notified of this action until July 23. On July 24 Nemer notified Eagle Sales of its intention to arbitrate the legality of simultaneously adding four dealerships in the Albany area. It then commenced an action in district court to compel arbitration and to obtain injunctive relief preventing Eagle Sales from implementing the new franchises. Nemer relied on Paragraph 7 of its franchise contract.

At an August 7 hearing in district court, Eagle Sales conceded its duty to arbitrate, but contested Nemer's request for a *status quo* injunction. In its August 18, 1992 order the district court applied the test for granting a preliminary injunction and denied Nemer's request for that relief. The district court found appellant failed to show (1) it is likely to succeed on the merits of the underlying dispute about the legality of the added franchises; (2) it would suffer irreparable harm if an injunction did not issue; and (3) the balance of the equities was in its favor because the four new Jeep–Eagle dealers would be adversely affected by the issuance of an injunction.

Nemer then moved for reconsideration and reargument pursuant to Fed.R.Civ.P. 59(e), which was denied in a September 21, 1992 order. The district court held that it properly looked to the merits of the underlying dispute, even though that dispute was going to arbitration, because Paragraph 7 "linked the merits of the status quo provision with the merits of the underlying dispute." From the August 18 and September 21, 1992 orders, Nemer has appealed. We reverse.

## DISCUSSION

Appellant contends the district court erred when it based its decision on the merits of the parties' underlying dispute in both the disputed orders. It urges that we look at Paragraph 7 of the franchise agreement and apply instead the equitable test for specific performance. Eagle Sales responds that the

district court correctly considered the merits of Nemer's underlying claim, regardless of whether the equitable test applied is for specific performance or for a preliminary injunction. In the alternative, Eagle Sales declares that appellant failed to satisfy the requirements for specific performance.

### A. Standard of Review

■ When reviewing a denial of injunctive relief, an appellate court must determine whether the district court abused its discretion. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Connecticut Resources Recovery Auth. v. Occidental Petroleum Corp.*, 705 F.2d 31, 35 (2d Cir.1983). Abuse of discretion may entail an error of law or fact in the district court's consideration of injunctive relief or an error in the substance or form of the court's injunctive order. *See Coca–Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 315 (2d Cir.1982). An abuse of discretion will be found where the error is the predicate for the district court's disputed decision. *Id.* at 316.

In its August 18 order the district court applied the traditional test for a preliminary injunction. It denied plaintiff relief because of Nemer's failure to show the likelihood of success on the merits in the underlying dispute with Eagle Sales. In its September 21 order denying Nemer's motion for reconsideration, the district court again held it had properly reached the merits of the parties' disagreement based on the language of their contract. We conclude that neither applicable precedent nor the contract language afford a basis for reaching the merits of Nemer's arbitrable dispute, and the district court abused its discretion in doing so.

### B. Injunctive Relief Standard

Unlike a party seeking specific performance, a party that requests a preliminary injunction *must* discuss the merits of the dispute underlying the injunction motion. The requirements for a preliminary injunction are well settled: a party seeking relief must show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

■ The test for specific performance is more flexible. It initially requires proof that (1) a valid contract exists between the parties, (2) the plaintiff has substantially performed its part of the contract, and (3) plaintiff and defendant are each able to continue performing their parts of the agreement. *See Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F.Supp. 1087, 1104 (S.D.N.Y. 1989). A party seeking relief must show equitable factors in its favor, for example, the lack of an adequate remedy at law, and must also demonstrate that its risk of injury, *if* the injunction is denied, is one that after balancing the equities entitles it to relief. *Id.* One of the factors balanced is irreparable harm, a common element under both tests. *See Guinness–Harp Corp. v. Jos. Schlitz Brewing Co.*, 613 F.2d 468, 472 (2d Cir.1980); *see also Payroll Express Corp. v. Aetna Casualty and Sur. Co.*, 659 F.2d 285, 292 (2d Cir. 1981) (specific performance injunction granted where money damages speculative and court · found absence of "offsetting equities militating against a grant of equitable relief"); *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1067 (2d Cir.1972) (specific performance injunction upheld based on contract language and showing of irreparable damage).

■ In its complaint plaintiff requested "a preliminary injunction and a final injunction directing Jeep Eagle to specifically perform the provisions of Paragraph 7." It is understandable therefore that a trial court could be rushed into relying on preliminary injunction analysis. Nonetheless, when a party seeks a preliminary injunction, *not* to further proceedings in the district court—but to process proceedings in some other forum, notably, the arbitration forum—then the relief requested is more akin to a permanent injunction, even though for a limited time. It is permanent insofar as the trial court is concerned because, unlike its grant of a preliminary injunction, the parties—presently before the trial court, but contemplating fur-

ther proceedings elsewhere—plan to conduct no further litigation in the district court. *See Manning v. Energy Conversion Devices, Inc.,* 833 F.2d 1096, 1100–01 (2d Cir.1987); *see also Guinness–Harp,* 613 F.2d at 471. Both Nemer and Eagle Sales agree that the merits of their dispute—whether Eagle Sales legally granted four new franchises in the Albany market area—will be litigated in the arbitration forum. Therefore, Nemer's request was not for a traditional preliminary injunction, and the district court erred in treating it as such.

In fact, the circumstances we face are quite similar to those analyzed in *Guinness–Harp.* In that case a brewery sought to end its relationship with a beer distributor. The parties' contract called for arbitration of disputes before the brewery terminated its distributor, and the distributor sought an injunction halting termination until arbitration was complete. In granting the injunction, we relied on the contract language and applied the equitable test for specific performance. *See* 613 F.2d at 471–72. Thus, the rule seems to be fairly established that where a party's request for a *status quo* injunction pending arbitration is grounded in the words of a contract, specific performance analysis is required. *See Connecticut Resources,* 705 F.2d at 35; *Erving,* 468 F.2d at 1066–67. *But cf. Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 910 F.2d 1049, 1052–54 (2d Cir.1990) (holding that district court has jurisdiction to issue *status quo* injunction pending arbitration but not deciding appropriate standard for injunctive relief); *Roso–Lino Beverage Distribs., Inc. v. Coca–Cola Bottling Co. of N.Y., Inc.,* 749 F.2d 124, 125 (2d Cir.1984) (per curiam) (where underlying contract did not contain *status quo* provision, court applied preliminary injunction analysis in deciding whether to issue an injunction pending arbitration).

■ Hence, we hold *status quo* injunctions pending arbitration are final in nature because the merits of the parties' underlying dispute will be resolved by an arbitrator. Moreover, when a motion for such an injunction is based on a *status quo* provision in the parties' contract, it must be analyzed under specific performance principles.

## C. Application

■ Before balancing the equities, we examine Nemer's contract with Eagle Sales to determine initially whether it permits a *status quo* injunction.

1. *Contract Language* Paragraph 7 is a broad arbitration provision covering any and all disputes between Nemer and Eagle Sales. When disputes under it concern any one of three distinct issues—the legality of terminating Nemer's franchise, adding a new Jeep–Eagle dealership or relocating an existing Jeep–Eagle dealership—Paragraph 7 requires Eagle Sales to "stay implementation of the decision ... until the decision of the arbitrator has been announced."

In its September 21 order the district court ruled that the language of Paragraph 7 linked the merits of the *status quo* provision with the merits of the underlying arbitration. Specifically, the trial court held it proper to consider the merits of the underlying dispute because "[Eagle Sale's] status quo obligations [are] dependent upon Nemer's invocation of the right to arbitrate the legality of appointing new dealers." Of course the *status quo* obligations depend upon the invocation of arbitration; if no arbitration is sought, then there is no *status quo* to preserve. Yet, simply because *status quo* obligations depend upon the *invocation* of arbitration does not mean they depend upon the *likely success* of arbitration. The district court clearly misread Paragraph 7 in reaching this conclusion.

Eagle Sales insists the district court appropriately reviewed the merits of the arbitrable dispute because (1) the "non-exclusive" nature of the franchise shows that Nemer had no legitimate claim for arbitration, and (2) the language of Paragraph 7 required Nemer to invoke the *status quo* provision before Eagle Sales implemented the new dealerships. By insisting that appellant failed to raise a legitimate dispute for arbitration, appellee is in effect suggesting that we review the merits of Nemer's claim that awarding the new franchises was illegal. As already discussed, a request for a *status quo* injunction pending arbitration does not require examination of the merits of the under-

lying disputes. Moreover, appellee's contention is unpersuasive for several other reasons. Fully aware of the non-exclusive nature of Nemer's franchise, the district court nonetheless ordered arbitration. An arbitration order would be meaningless were no legitimate dispute to exist and where no rights remained to be determined. We disagree with Eagle Sale's assertion that the district court had to make an explicit finding that a genuine dispute exists. Such finding is implicit in every order to arbitrate.

Again, the contract itself contemplates that the parties could dispute the legality of new dealerships. Such a disagreement may concern the manner in which the dealerships are granted. Read as a whole, the contract grants a non-exclusive franchise, gives appellee the discretion to add new dealerships and gives appellant the right to preserve the *status quo* when it disputes the legality of adding a new Jeep–Eagle dealer. Appellee would have us interpret the contract so that the first two provisions cancel out the *status quo* provision. We decline to read the contract in that fashion, particularly where its provisions reasonably may be reconciled. *See Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.*, 760 F.2d 390, 395–96 (2d Cir.1985).

Appellee also avers that appellant lost the protection of Paragraph 7's *status quo* provision because it did not demand arbitration and maintenance of the *status quo* until after Eagle Sales had granted the four new franchises. But, the contract established no time limits for invocation of arbitration. It requires only "written notification," which appellant states it provided on July 24, 1992, a day after it learned of Eagle Sales' action, though the latter declares it notified Nemer on July 20th. According to the *status quo* provision, Eagle Sales may implement a disputed decision immediately only if the dealer "in any way attempt[s] to avoid the obligations of this Paragraph 7." Nemer has not tried to avoid its promise to arbitrate, and appellee does not allege that Nemer failed to follow the procedures outlined in Paragraph 7.

Rather, appellee contends appellant should have invoked arbitration and the *status quo* provision in February 1992, when it was informed that appellee was considering the new franchises. But at that time, the dispute was not ripe for arbitration because it would have involved "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3532, at 112 (2d ed. 1984). In sum, the franchise agreement provides for a *status quo* injunction, and on these facts appellant did not forfeit its right to such relief.

2. *Equities* Both parties agree they have a valid contract under which Nemer substantially has performed. To obtain specific performance therefore a plaintiff must show the inadequacy of money damages and a balance of equities in its favor. The district court held that Nemer only offered speculative proof of damages and that harm to the four new Jeep–Eagle dealers outweighed any hardship appellant suffered. Because the district court applied the wrong standard, it reached the wrong result.

Paragraph 7 itself contemplates that the manufacturer's decision to add a new dealership will cause an existing dealer serious harm, difficult to compensate with money damages, because the contract requires Eagle Sales to maintain the *status quo* only in that and two other circumstances. Appellee yet insists appellant is not harmed by its decision because Nemer may continue to sell Jeep–Eagle products in the Albany market. In making this statement, appellee attempts to distinguish those cases where we granted *status quo* injunctions to stop termination of a franchise. *See, e.g., Roso–Lino*, 749 F.2d at 125–26; *Guinness–Harp*, 613 F.2d at 473; *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970).

We do not read these cases so narrowly. Major disruption of a business can be as harmful as termination, and a *"threat to the continued existence of a business can constitute irreparable injury." John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 28–29 (2d Cir.1978) (emphasis added) (citing *Semmes Motors*, 429 F.2d at 1205), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979).

As evidence of the harm it suffered, appellant points to the fact that the number of customers entering its showroom decreased by 20 percent after the new franchises were implemented on July 20. It also states that during most of August it sold 15 new vehicles, down from sales of 25 vehicles in July. Appellant alleges that Eagle Sales cut back its allocation of new vehicles after the new franchises were granted so that it now receives 40 percent fewer of the most popular models for sale. Appellee's response that Nemer's sales in the summer of 1992 increased from those in 1991 and 1990 is unavailing. This increase in sales perhaps more accurately reflects the ongoing growth of Nemer's new business, and, in any event, does not make the crucial comparison in sales before and after the new franchises were awarded.

In addition to this loss of business, appellant has demonstrated that the four new Jeep–Eagle dealerships seriously threaten its continued existence and that money damages are inadequate compensation for such loss. *See Guinness–Harp*, 613 F.2d at 473. Calculation of Nemer's lost profits would be highly speculative because—as a two-year-old dealership that only began to show a profit in May 1992—it lacks a track record from which to extrapolate. Doubts concerning the adequacy of money damages should be resolved in favor of granting specific performance. *See* Restatement (Second) of Contracts, § 359, cmt. a (1981).

Further, the balance of the equities in this case tips decidedly in favor of appellant being granted specific performance of its contract because neither Eagle Sales nor the four new dealers will suffer harm proportionate to appellant's loss of business as a result of a *status quo* injunction. *See United States v. Alexander*, 736 F.Supp. 1236, 1242 (N.D.N.Y. 1989), *aff'd*, 901 F.2d 272 (2d Cir.1990). As a practical matter, all four new dealers already possess Chrysler franchises and may continue to sell these automobiles pending arbitration. Thus they will not suffer "unreasonable hardship or loss." Restatement, *supra*, § 364(1)(b). In contrast, Nemer's business depends exclusively on the sale of Jeep–Eagle vehicles, and these sales declined significantly after the new franchises were implemented. Moreover, because the four dealers acquired their franchises *after* Nemer entered its contract with Eagle Sales, they are not third parties with rights superior to appellant's. *See Joneil Fifth Ave. Ltd. v. Ebeling & Reuss Co.*, 458 F.Supp. 1197, 1200 (S.D.N.Y.1978).

Moreover, that Eagle Sales may have to face legal action by the new dealerships when their franchises are suspended pending arbitration does not weigh heavily against Nemer's claim for equitable relief. The fact that appellee bound itself in conflicting contracts should not work to penalize appellant, especially because appellee itself drafted the contract language upon which appellant relies. Again, the arbitration remedy for which Nemer and Eagle Sales bargained would remain a hollow formality were the *status quo* not preserved. *See Blumenthal*, 910 F.2d at 1053.

Finally, in the event Nemer is successful in the underlying arbitration, the arbitrator's ability to fashion an adequate remedy will be severely thwarted if the new franchises have become well-established in the meantime. Appellant exercised its right to request arbitration within either one or four days after learning the new dealerships were created, when Eagle Sale's potential liability to the new dealers was minimal. Consequently, under the circumstances of this case it is not inequitable to grant appellant specific performance.

## CONCLUSION

The district court orders dated August 18 and September 21, 1992 are accordingly reversed and the case is remanded with directions that appellant's application for a *status quo* injunction compelling specific performance by appellee be granted.