**BANK OF HAWAII, Plaintiff,**

**v.**

**KEPAOA DEVELOPMENT CORPORATION, Defendant.**

High Court of American Samoa
Trial Division

CA No. 98-04

May 3, 2005

Before RICHMOND, Associate Justice; LOGOAI, Chief Associate Judge; and ATIULAGI, Associate Judge.

Counsel: For Plaintiff, Jennifer Joneson, Barry I. Rose
 For Defendant, Mark F. Ude

## ORDER DENYING MOTIONS FOR APPOINTMENT OF RECEIVER AND ENFORCEMENT OF RENT ASSIGNMENT CLAUSE

Defendant Kepaoa Development Corporation ("Kepaoa") took out a leasehold mortgage ("the mortgage") with Bank of Hawaii ("BOH"). Kepaoa secured the mortgage with a lease that it owned on land in Utulei Village and the improvements on the land ("the premises"). The mortgage agreement provided that in the event of default, BOH had the right to have a receiver appointed and also had the right to have any rents from the premises assigned to it. Kepaoa then subleased a portion of the premises to British Petroleum ("BP"). Later, Kepaoa defaulted on the mortgage loan. BOH then demanded that BP forward the sublease payments to it directly, rather than sending them to Kepaoa. BP did not do so.

Now, BOH asks the Court to appoint a receiver, who would directly collect BP's sublease payments, to ensure that Kepaoa does not squander or hide them. In the alternative, BOH asks the Court to enforce the assignment of rents provision, which would shift Kepaoa's interest in the sublease payments to BOH.

## I. Appointment of a Receiver

The mortgage contract provides that if the mortgagee properly forecloses the mortgage it has "the immediate right to a receivership upon ex parte order . . . ." (May 11, 2000 Leasehold Mortgage, pg. 3, ln. 19). BOH asserts this court is bound by that clause and therefore should appoint a receiver. BOH cites *Union Dime Savings Bank v. 522 Deauville Assoc.*, 398 N.Y.S.2d 483 (N.Y. Sup. 1977) in support of its position. *Union Dime*, however, does not stand for such a proposition. Rather, *Union Dime*, and the cases cited therein, state that in the event that a receiver is appointed, the terms of the mortgage may affect the rights the mortgagor and mortgagee have with relation to the receiver. Therefore, under *Union Dime,* the terms of the mortgage do not force a court into appointing a receiver.

■ In fact, the clear weight of authority holds that a mortgage's appointment of receiver clause does not bind a court into appointing a receiver. The California Supreme Court, in *Baker v. Varney*, 62 P. 100, 101 (Cal. 1900), stated that "[n]o stipulation can confer jurisdiction upon the court to appoint a receiver in a case where the court has no authority given by law." The Supreme Court of Idaho, in *Northwestern & Pacific Hypotheekbank v. Dalton*, 256 P. 93, 95 (Idaho 1927), stated that "[t]he

rule is well settled that jurisdiction to appoint a receiver cannot be conferred on a court by stipulation or consent of the parties. The right must exist under the law independent of the stipulation, and grounds justifying appointment [of a receiver] must be sufficiently alleged, in order to confer jurisdiction." The Supreme Court of Arizona, in *Wingfoot Cal. Homes Co. v. Valley Nat. Bank of Phoenix*, 248 P.2d 738, 738 (Ariz. 1952), stated that "[t]he right of a court to appoint a receiver must exist under the law independent of the contract in question." Lastly, a federal bankruptcy court, in *In re Glessner v. Union Nat. Bank & Trust Co.*, 140 B.R. 556, 560 (Bankr. D. Kan. 1992), stated that "[e]ven where the mortgage provides for appointment of a receiver on default, mortgagees have been required to apply to the courts for a receiver."

■ In conclusion, courts are not bound by appointment of receiver clauses. Courts should, instead, conduct an independent analysis to determine whether or not it is proper to appoint a receiver. Therefore, we will examine the true merits of BOH's application for a receiver.

■ A court's power to appoint a receiver is "limited almost exclusively to cases where the remedy seems necessary in order to prevent fraud, or to protect and preserve the property, or its rents and profits, against imminent danger of loss." 65 AM.JUR.2D *Receivers* § 27 (1972). "The power should not be exercised where there is no fraud or imminent danger of the property being lost, injured, diminished in value, destroyed, squandered, wasted, or removed from the jurisdiction." *Id.* The appointment of a receiver is considered to be an "'extraordinary remedy that should be employed with the utmost caution and granted only in cases of clear necessity to protect plaintiff's interest in the property.'" *CFTC v. Comvest Trading Corp.*, 481 F.Supp. 438, 441 (D. Mass. 1979) (citing 12 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2983 at p. 21 (1973)).

In *GA Enterprises, Inc. v. Leisure Living Communities, Inc.*, 355 F.Supp. 947, 949 (D. Mass. 1973), the court stated that the appointment of a receiver "is, like an injunction, an extraordinary remedy and ought never to be made except in cases of necessity upon a clear showing that . . . [an] emergency exists, in order to protect the interests of the plaintiff in the property."

■ The First Circuit, in *Chase Manhattan Bank, N.A. v. Turabo Shopping Center, Inc.*, 683 F.2d 25, 26-27 (1st Cir. 1982), found that "to warrant the appointment of a receiver . . . there must be something more than the inadequacy of the security and the doubtful financial standing of the debtor." The 'something more' that courts have looked for includes "fraudulent conduct on the part of the defendant; imminent danger that property would be lost, concealed, injured, diminished in value, or

squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and the plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property." *CFTC*, 481 F. Supp. at 441 (citations and footnotes omitted). Therefore, in sum, courts should reserve the appointment of a receiver to rather extreme situations and avoid making such an appointment if there is an adequate legal remedy.

■ This Court does not see an extreme situation in the case before us. BOH has presented no evidence of fraud or imminent danger that future sublease payments will be substantially wasted away or removed from the jurisdiction. It appears that Kepaoa was forwarding at least 80% of the sublease payments to BOH. Plaintiff BOH presents no evidence that the payments will stop or become substantially smaller or that the subleased property will be damaged or diminished in value.

Moreover, and most importantly, there is an available legal remedy. As discussed below, the contract contains an enforceable assignments clause and, therefore, by enforcing that provision, this Court can assure that BP's sublease payments are forwarded directly to BOH, eliminating the need for a receiver.

## II. Assignment of Rent

The mortgage agreement provides that in the event of default, all rents and profits from the property are assigned to the mortgagee—BOH. (May 11, 2000 Leasehold Mortgage, pg. 3, ln. 14). BOH asserts that this clause gives them the right to directly collect all sublease payments from BP, who is subleasing the premises from the Kepaoa.

■ Assignment of rent clauses in mortgage agreements are generally legal and enforceable. *See, e.g., Commerce Bank v. Mountain View Village, Inc.*, 5 F.3d 34, 38 (3rd Cir. 1993); *FDIC v. Int'l Property Management, Inc.*, 929 F.2d 1033, 1035 (5th Cir. 1991); *In re Dupell*, 235 B.R. 783, 791 (Bankr. E.D. Pa. 1999); *Hawai`i Nat'l Bank v. Cook*, 58 P.2d 60, 67 (Haw. 2002).

■ A mortgagee's interest in future rent payments may come in one of two forms: an absolute assignment or a security interest. The primary difference between the two is the timing in which the interest in the rent payments vests in the mortgagee. In an absolute assignment, the mortgagee gains an interest in the third party rent payments as soon as the mortgage is executed and may start to receive those payments immediately upon mortgagor's default. In a security interest, the mortgagee has no interest in the third party rent payments until it takes

actual or constructive possession of the property upon default. *Hawaii Nat'l Bank*, 58 P.2d at 67-68. A mortgagee takes constructive possession of the property by alerting the tenants that the mortgagor has defaulted and that their payments should thereafter be sent directly to the mortgagee. *Id.*; *In re Dupell*, 235 B.R. at 791.

 Whether the assignments clause acts as an absolute assignment or a security interest depends on the language of the mortgage contract and the intent of the parties. *See FDIC*, 929 F.2d at 1036, *FDIC v. Dutch Lane Assoc.*, 775 F. Supp. 133, 139, (S.D.N.Y. 1991). Most courts disfavor absolute assignments and only conclude that such is present if the language of the mortgage unambiguously states so. *See FDIC*, 929 F.2d at 1037; *Hawaii Nat'l Bank*, 58 P.2d at 68.

In the present controversy, the relevant mortgage clause provides that "on failure to make payment, . . . Mortgagee shall have the immediate right to receive and collect all rents and profits due, accrued or to become due. Such rents and profits are hereby assigned to Mortgagee . . . ." (May 11, 2000 Leasehold Mortgage, pg. 3, ln. 14). It is unclear whether this language is unambiguous enough to create an absolute assignment. However, the issue is moot because BOH has already taken constructive possession of the premises by alerting BP that Kepaoa had defaulted and demanding direct payment. Therefore, under either interpretation of the clause, BOH's interest in the sublease payments has vested.

In sum, we hold that the mortgage included an enforceable and currently vested assignment of rents clause.

### III. Court's Discretion in Ordering Specific Performance

 By asking the Court to enforce the assignment of rents provision, BOH is asking the Court to order specific performance. *F.D.I.C. v. Jackson-Shaw Partners No. 46 Ltd.*, 1993 WL 483261 at *2 (N.D. Cal Nov. 17, 1993) (plaintiff brought suit, seeking specific performance of assignment of rents clause). In other words, BOH is not asking the Court to grant them an award of money damages. Instead, they are asking the Court to force Kepaoa to fulfill a contractual obligation; namely, the obligation to assign its rents and profits to BOH now that it has allegedly defaulted. *See* DAN B. DOBBS, LAW OF REMEDIES 189-90 (2nd ed. 1993) ("A specific performance decree is a court order compelling the defendant to perform the contract. The main advantage to the plaintiff is that it provides the very performance contracted for, not a money substitute.").

Traditionally, courts have been given wide discretion in granting specific performance. *Wesely v. Eells*, 177 U.S. 370, 376 (1900) ("Specific performance is not an absolute right. It rests entirely in judicial discretion, exercised, it is true, according to the settled principles of equity, and not arbitrarily or capriciously, yet always with reference to the facts of the particular case.") (*citing Hennessey v. Woolworth*, 128 U.S. 438, 442 (1888)). In using its discretion, a court has "the power to adjust all the differences between parties arising from the cause of action in order to do complete justice and prevent further litigation, whether or not the particular relief was requested." *Williams v. Husain*, 2003 WL 22172212 at *6 (Cal. App. 1 Dist. Sept. 22, 2003) (internal quotations omitted); *see also Union Planters Nat'l Bank*, 634 S.W.2d 270, 273 (Tenn. Ct. App. 1982) (stating that in granting specific performance, a court should "adjust the equities of complainant to the equities of defendant and thus do complete justice between the parties.") (internal quotations omitted).

More specifically, a court has the discretion to decline ordering specific performance if doing so would produce a hardship upon one of the parties. *United States v. Georgia-Pacific Co.*, 421 F.2d 92, 104-05 (9th Cir. 1970) ("[c]ourts of equity have long refused to decree specific performance where the result would be . . . unduly harsh"); *Van Wagner Advertising Corp. v. S & M Enterprises*, 492 N.E.2d 756, 761 (N.Y. 1986) ("It is well settled that the imposition of an equitable remedy must not itself work an inequity, and that specific performance should not be an undue hardship."). *See also United States v. Alexander*, 736 F. Supp. 1236, 1242 (N.D.N.Y. 1989) (stating that specific performance "is not demandable as a matter of absolute right; rather, the remedy rests entirely in the court's discretion . . . and will not be ordered if under all the circumstances it would be inequitable to do so as where the effect would be disproportionate in its harm to the breaching party and its assistance to the non-breaching party") (internal citations omitted).

In the present controversy, after reviewing all of the facts and circumstances and considering all of the equities involved, we conclude that ordering Kepaoa to assign all of its rents and profits from the premises to BOH would result in an undue hardship upon Kepaoa, would not do complete justice between the parties and could lead to further litigation.

Kepaoa's proprietor inherited the business from his father at a time when the business was burdened with a substantial amount of debts and liabilities. Facing difficult circumstances, he turned to BOH for a mortgage loan in an attempt to keep his head above water while he tried to get the business in order. The loan proceeds, then, were not meant to be used for long-term investment, but simply as a stop-gap measure in

111

desperate times. And, accordingly, the loan was structured to meet such a goal. The period of the loan was to be a relatively short four years[1], with a principle amount of $451,023.42 lent at an interest rate of 8% per annum. Kepaoa was to pay $3,500.00[2] each month with the remaining balance due in a massive balloon payment at the end of the loan period. Thus, as it stood, the terms of the loan were forcing Kepaoa's proprietor to walk a very thin line; and this, at a time when the weight of the business's previous debts were already pushing him back against a wall.

However, despite these pressures, the evidence indicates that Kepaoa has made a payment every single month to date, and pledges that it will continue making such payments. This, despite the fact that Kepaoa's principle source of income, the lease payments from BP, amount to $4,000.00 per month, only $500.00 more than Kepaoa's monthly due on the loan. It is only Kepaoa's inability to pay the colossal balloon payment that has put them into possible breach.

Now, despite the fact that Kepaoa is continuing to make its loan payments, and doing so by offering over 87% of its BP income, BOH wishes to have the entire 100% of BP's lease payments assigned to them.

We conclude that, at this time, the principles of equity persuade us not to order Kepaoa into assigning the entirety of its BP lease income to BOH. Kepaoa is in a very difficult financial position and we find that stripping it of the tiny percentage of BP's lease payments which it now keeps would cause the company undue hardship, while only offering nominal benefit to BOH.[3] Kepaoa is already offering 87% of the BP income to BOH and BOH has not disputed that Kepaoa has made every payment on time, and continues to make monthly payments. This, while the only alleged breach of the mortgage involves Kepaoa's failure to meet the terms of the onerous balloon payment provision. If we were to order

---

[1] Originally, the term of the loan was only three years. However, an April 15, 2003 amendment changed it to four years.

[2] Originally, the monthly payment was set at $2,710.00. However, an April 13, 2003 amendment changed the monthly payment to $3,500.00.

[3] This conclusion is heavily influenced by the fact that Kepaoa is currently offering $3,500.00 each month to BOH, while only receiving $4,000.00 each month from BP. In the event that Kepaoa begins to offer a reduced amount each month to BOH, this conclusion very well could change. Similarly, if BP begins to pay Kepaoa more than $4,000.00 a month, under the terms of their lease, or otherwise, we would strongly encourage Kepaoa to continue to hold only 13% of that increased amount if it wishes for the balance of equities under this decision to remain intact. If those equities were to change, a second motion for the enforcement of the assignments clause could very well be granted.

specific performance of the assignments clause, Kepaoa would be forced to part with the final $500.00 of the BP lease payments, a small amount to a large bank like BOH, while at the same time a relatively sizeable sum to a struggling company like Kepaoa. Therefore, in the interests of fairness and equity, we conclude that we would not be doing complete justice by forcing the already beleaguered Kepaoa to part with the remaining 13% of its BP income.

BOH may later pursue additional legal remedies in its current breach of contract action, however, in the current motion it plead for this court to administer an equitable remedy. And thus, as such, in doing so we must use our discretion to make certain that the principles of justice and fairness our reflected in our decision. Here, we simply hold that because of Kepaoa's current effort to continue payments, coupled with its precarious financial position, the requested equitable remedy would "itself work an inequity." *See Van Wagner Advertising Corp.*, 492 N.E.2d at 761. Thus, in conclusion, we decline BOH's request to enforce the assignment of rents provision.

### Order

1. We deny BOH's motion to appoint a receiver

2. We deny BOH's motion to enforce the assignment of rents provision.

It is so ordered.