Jeffrey M. BLUM, Plaintiff–Appellant,

v.

John H. SCHLEGEL, in his personal & official capacity as Associate Dean of the State University of New York at Buffalo School of Law, David B. Filvaroff, in his personal & official capacity as Dean of the State University of New York at Buffalo School of Law, William R. Greiner, in his personal & official capacity as Provost & President of the State University of New York at Buffalo, Kenneth J. Levy, in his personal & official capacity as Acting Provost of the State University of New York at Buffalo, Alan S. Carrel, in his personal & official capacity as Associate Dean of the State University of New York at Buffalo School of Law, Elizabeth B. Mensch, Professor of Law, Alan D. Freeman, Professor of Law, Charles P. Ewing, Professor of Law, D. Bruce Johnstone, in his official capacity as Chancellor of the State University of New York, John Doe, Officer of the State University of New York at Buffalo, Jane Doe, Officer of the State University of New York at Buffalo, Defendants–Appellees,

Dianne Avery, Movant,

Daniel Harris, Petitioner.

No. 811, Docket 93–7689.

United States Court of Appeals, Second Circuit.

Argued Dec. 7, 1993.

Decided March 4, 1994.

Jeffrey M. Blum, Williamsville, NY, pro se.

Douglas S. Cream, Asst. Atty. Gen., Buffalo, NY (Robert Abrams, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., Nancy A. Spiegel, Asst. Atty. Gen., of counsel, David Koepsell, student legal aide, on the brief), for defendants-appellees.

Before: NEWMAN, Chief Judge, OAKES and CARDAMONE, Circuit Judges.

OAKES, Senior Circuit Judge:

This appeal is from the denial of a motion for a preliminary injunction by the United States District Court for the Western District of New York, William M. Skretny, Judge. Appellant Jeffrey Blum's amended complaint alleges that his rights under the First, Fifth and Fourteenth Amendments were violated by the handling of his tenure and promotion review at a State university law school. Because he has shown neither a likelihood of success on the merits nor sufficiently serious questions going to the merits to make them a fair ground for litigation together with a balance of hardships "tipping decidedly" toward him, *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam), we affirm.

## I. BACKGROUND

### A. Factual History

Plaintiff/Appellant Jeffrey M. Blum joined the faculty of the State University of New York at Buffalo School of Law (the "Law School") as an associate professor in September, 1985. Blum was appointed to a six-year "tenure track" position, with tenure review available in the academic year 1990–1991. Blum's appointment provided that if Blum were denied tenure in his sixth year, his appointment would be extended for another year.

On September 13, 1989, defendant David Filvaroff, then Dean of the Law School, informed Blum that Blum's chances of receiving tenure were poor. Filvaroff repeated this prognosis to Blum during a meeting on October 1, 1990. Following that meeting, Blum and Filvaroff exchanged a series of letters. In the first of this series, a six page

letter to Filvaroff dated October 16, 1990, Blum, *inter alia*, requested that his tenure and promotion review be scheduled for March 15, 1991. Joint Appendix at 16. In a four page reply dated November 1, 1991, Filvaroff acknowledged this request but also advised Blum that, in exceptional cases, tenure review could be deferred from the sixth to the seventh year. Filvaroff suggested that Blum avail himself of this option, deferring his tenure review until the academic year 1991–1992. During that time, Filvaroff further suggested that Blum accept a reduced teaching load and endeavor to improve his scholarship. Joint Appendix at 19.

Blum appeared receptive to Filvaroff's suggestions. In a letter to Filvaroff dated November 13, 1990, Blum wrote:

> Your suggestion that I defer coming up for promotion until next fall may be a step in the right direction.... However, I cannot commit to this option at the present time. Before it can be realistically evaluated two things must occur. First, I will need you to specify what the half-load option would involve specifically in terms of courses.... Second, I will need to obtain copies of fully proper appointment papers for academic year 1991–1992.

Joint Appendix at 24. While negotiating these conditions, Blum stressed in the same letter that he had already "come to rely" on the suggestion that he defer tenure review while accepting a reduced teaching load:

> I have come to rely on the option of coming up for promotion next fall in order to take advantage of the half-load option in the Spring as you suggest.

*Id.* Though Blum asserts that this letter referred only to his interest in deferring consideration for promotion to an elevated faculty rank, its reference to the "half-load option," which the dean had offered as a means of enhancing Blum's prospects for gaining *tenure*, permitted the district court to infer that Blum had indeed "come to rely" on the option to defer tenure review. Filvaroff acknowledged Blum's November 13 letter in a letter to Blum dated November 15, 1990. Filvaroff wrote:

I think you have made an appropriate choice in deciding to defer your tenure consideration until next fall. I will, accordingly, proceed with arranging for your appointment for the 1991–92 academic year and will supply you with the relevant confirmation.

Joint Appendix at 634.

On November 15, 1990, Blum sent Filvaroff a "brief supplement" to his letter of November 13.[1] Joint Appendix at 25. In that letter, Blum discussed "two matters [that] have occurred to me" since the November 13 letter. Blum explained that his request for "fully proper appointment papers" was a request for an appointment letter identical to his last appointment letter with some revisions to reflect the new period of appointment and any salary increases to which Blum might be entitled. Blum attached a copy of his last appointment letter.[2]

On November 16, 1990, Filvaroff responded to Blum's November 15 letter. He indicated that he was seeking both to resolve the specifics of Blum's spring course load and to obtain "appropriate written confirmation of your status for next year." Filvaroff indicated, however, that he believed such written confirmation to be unnecessary:

You will recall, I am sure, that you already have my letter of September 13, 1989, which makes it clear that if tenure were not granted during the current academic year, your contract would be extended to cover the 1991–92 academic year.

Joint Appendix at 28. Blum responded to the November 16 letter, writing:

My understanding from your letter is that we are in accord as to the continuing validity of your September 19, 1989 *promise to extend my current contract through August 31, 1992*, that you will seek to provide me with President Sample's written confirmation of this as quickly as reasonably possible, that the official appointment form I requested will be forthcoming, except

that it may take some time for complete approval and processing. Nevertheless, you do continue to guarantee the bottom line result. Please inform me by letter immediately if any of these understandings is incorrect. Obviously, it is a matter of some personal urgency that I be able to rely on these things.

Letter of Blum to Filvaroff dated November 16, 1990, Joint Appendix at 30 (emphasis added).

In a letter to Blum dated December 21, 1990, Filvaroff wrote:

As you are aware, your present appointment to the faculty is now scheduled to terminate on August 31, 1991, the sixth year of your appointment. In accordance with our earlier conversations, I have recommended to the Provost that you be reappointed for an additional one-year term beginning September 1, 1991, and extending to August 31, 1992. This will allow you additional time to continue work on your scholarship and allow presentation of your candidacy for promotion and tenure sometime next fall; it is my understanding that this complies with your wishes.

Joint Appendix at 635. The letter continued to apprise Blum of the fact that:

[because] you will have already served for three years as an Associate Professor, SUNY rules require that your reappointment be effected with a change of title. Thus, the formal documents will designate your status as that of a Visiting Associate Professor.

*Id.* Filvaroff apparently was referring to provisions of the University Handbook governing continuing appointments. Title B, § 3(a) of that Handbook provides:

Except as provided in subdivision (c) of this section, further employment as ... Associate Professor ... after the third consecutive year of service in any one or

---

1. This letter, apparently, was delivered personally by Blum to Filvaroff on the evening of November 15, 1993. *See* Joint Appendix at 28. It is unclear whether Blum had by then received Filvaroff's November 15 letter.

2. The second "matter" concerned secretarial support. In a letter to Filvaroff dated November 16, 1990, Blum asserted that his "discussion of the secretarial situation was not intended to place any new demands or conditions on anything." Joint Appendix at 30.

any several of these ranks at any one college must be on the basis of continuing appointment; provided, however, such appointment shall not be effective until made so by the Chancellor....

Joint Appendix at 31. Filvaroff appears to have been concerned that if Blum had been appointed to a fourth year as an Associate Professor, he would claim that he had been awarded a continuing appointment. This concern appears to have been well-founded for Blum, in a letter to Filvaroff dated January 5, 1991,[3] wrote:

your plan of separating the tenure from the promotion part of the process was a good way of making clear that I could not be gotten rid of through backstabbing and petty conspiracies.

Joint Appendix at 38.

In a letter dated February 1, 1991, Filvaroff responded to this letter and a letter from Blum dated January 21, 1991. In that letter, Filvaroff reviewed the extensive correspondence between him and Blum and responded "to the main substance of [Blum's] communication." Filvaroff characterized Blum's position in this way:

you now assert that you were assured not only that you would be reappointed for the 1991–1992 academic year, but that you would simultaneously be awarded tenure by administrative action—without any faculty review or recommendation whatsoever.

Joint Appendix at 636. Filvaroff then reviewed the extensive correspondence, effectively documenting that at all times Filvaroff never offered Blum anything beyond the opportunity to defer tenure consideration until the Fall of 1991 and that Blum's own correspondence demonstrates that Blum himself understood that his current contract would be extended only for one year through August 31, 1992.

Following this exchange of letters, Blum never explicitly requested that his tenure and promotion review occur in his sixth year rather than in the Fall of 1991. Rather, he wrote on February 4, 1991 of "a right to be reappointed as an 'associate professor' under the doctrine of promissory estoppel." Joint Appendix at 645. In any event, the Law School proceeded to prepare to conduct Blum's tenure and promotion review in the Fall of 1991. In a letter dated September 24, 1991, Professor Kenneth F. Joyce wrote Blum that Blum's Promotion and Tenure Subcommittee was prepared to proceed with "preparation for presentation of your tenure and promotion candidacy to the full Committee." Joint Appendix at 650. Joyce continued:

[The members of Blum's Promotion and Tenure Subcommittee] did not think it proper to proceed without your 'go ahead', since, as all would agree, you also have a right *not* to be evaluated and voted on by the [Promotion and Tenure] Committee.

*Id.* Accordingly, Joyce asked Blum for a clear statement as to whether he wished tenure and promotion review to proceed.

On April 2, 1992, in a document Blum styled "Personal Resolution" he stated "I ... do now declare—clearly, unambiguously and without conditions—that I do not want a Promotion and Tenure Evaluation of me to go forward." Joint Appendix at 676. Blum's contract expired on August 31, 1992.

**B. Procedural History**

On October 1, 1991, Blum commenced this action against the dean of the law school, the president of the university, and various other officers and professors of the university in their personal and official capacities pursuant to 42 U.S.C. § 1983 (1988) alleging violations of his First, Fifth, and Fourteenth Amendment rights and setting forth various state law claims.[4] On January 24, 1992, the district court granted defendants' motion to dismiss with leave to file an amended complaint. On February 20, 1992, Blum filed an amend-

---

3. Apparently, Blum had not yet received Filvaroff's letter dated December 21.

4. Plaintiff's original complaint also named the State of New York and the State University of New York. In his amended complaint, filed February 20, 1992, Blum dropped these defendants. While we will not detail all of the proceedings following the filing of the original complaint, we will note some salient aspects of the case's procedural history.

ed complaint. The motion for a preliminary injunction that is at issue in this appeal was filed on October 7, 1992. On December 14, 1992, Magistrate Judge Heckman entered a report recommending that Blum's motion for a preliminary injunction be denied. On July 1, 1993, the district court entered an order accepting in part and modifying in part the magistrate's recommendation and denied Blum's motion for a preliminary injunction. On July 8, 1993, Blum filed a timely notice of appeal. 830 F.Supp. 712.

## II. DISCUSSION

■ A movant for preliminary injunction must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy,* 596 F.2d at 72 (citations omitted); *see also Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 135–36 (2d Cir.1992) (citing *Jackson Dairy* ). Where the facts are of controlling relevance, we normally review the denial of a motion for a preliminary injunction only for an abuse of discretion in finding an absence of irreparable harm and/or an insufficient likelihood of success on the merits. *See Thornburgh v. American College of Obstetricians & Gynecologists,* 476 U.S. 747, 757, 106 S.Ct. 2169, 2177, 90 L.Ed.2d 779 (1986); *Nemer Jeep–Eagle, Inc. v. Jeep–Eagle Sales Corp.,* 992 F.2d 430, 433 (2d Cir.1993). Such an abuse, however, may consist of " 'an error of law, an error of fact, or an error in the substance or form of the trial court's order.' " *Polymer Technology Corp. v. Mimran,* 975 F.2d 58, 61 (2d Cir.1992) (quoting *Coca–Cola Co. v. Tropicana Prod., Inc.,* 690 F.2d 312, 315 (2d Cir.1982)); *see also* Henry J. Friendly, *Indiscretion about Discretion,* 31 Emory L.J. 747, 773–78 (1982). We find that the district court correctly determined that Blum failed to demonstrate either a likelihood of success on the merits or the existence of sufficiently serious questions going to the merits to make them a fair ground for litigation coupled with a balance of hardships tipping decidedly in his favor.

### A. Likelihood of Success on the Merits

#### 1. Blum's First Amendment Claims

■ Blum argues that he has been targeted for adverse employment action in violation of his right to free speech under the First Amendment. Blum's Brief at 46–49. To succeed on his First Amendment claims, Blum must demonstrate by a preponderance of the evidence that the speech at issue was protected, that he suffered an adverse employment action, and that there was a causal connection between the protected speech and the adverse employment action. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–87, 97 S.Ct. 568, 574–76, 50 L.Ed.2d 471 (1977). In particular, the causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action. *See Ezekwo v. NYC Health and Hosp. Corp.,* 940 F.2d 775, 780–81 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991). Should a plaintiff demonstrate these factors, the defendant has the opportunity to demonstrate by a preponderance of the evidence that it would have undertaken the same adverse employment action "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576.

The district court found that Blum failed to demonstrate any of the three requirements under *Mount Healthy.* Although we find that the district court incorrectly determined that Blum did not engage in protected speech, we find that the district court correctly determined that Blum failed to demonstrate either the existence of an adverse employment action or a causal connection between the protected speech and the allegedly adverse employment action.

Before reviewing the district court's finding, we note the inherent difficulty presented by First Amendment claims in the context of employment disputes between teachers and State universities.

■ The Supreme Court has held that a "public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers,* 461 U.S. 138,

140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)). Recognizing the "enormous variety of fact situations in which critical statements by . . . public employees may be thought by their superiors . . . to furnish grounds for dismissal," the Supreme Court has declined to "lay down a general standard against which all such statements may be judged." *Pickering*, 391 U.S. at 569, 88 S.Ct. at 1735. Instead, to determine the extent to which a State may regulate the speech of its employees, courts must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1735; *see also Vasbinder v. Ambach*, 926 F.2d 1333, 1339 (2d Cir.1991). The extent of permissible regulation of State employee speech, therefore, depends both on the nature of the speech and on the nature of the public services performed through a particular employee or class of employees. Because the criteria for efficient performance of public service may differ with respect to different employees, the appropriate balance may differ with respect to different types of State employees. For example, while it may be impermissible to discharge a "clerical employee in a county Constable's office . . . for remarking, after hearing of an attempt on the life of the President, 'If they go for him again, I hope they get him,' " *Rankin v. McPherson*, 483 U.S. 378, 379–80, 107 S.Ct. 2891, 2894, 97 L.Ed.2d 315 (1987), it may be permissible to discharge, for the same remark, an employee that serves a "confidential, policy-making, or public contact role." *See id.* at 390–91, 107 S.Ct. at 2900. Thus, to determine the appropriate balance a court should consider both the nature of the speech and the nature of the services performed by the employee.

A law school performs a variety of services. Through its faculty, it imparts to students substantive knowledge of the law and trains students in methods of legal research, thinking, writing, and oral advocacy. But law schools do more than train lawyers—by fostering scholarly research, law schools both advance our understanding of the law and play a role in shaping the law itself. To fulfill these many roles, law schools promote an environment characterized by the active exercise of First Amendment rights. Indeed, free and open debate on issues of public concern are essential to a law school's function. The Supreme Court's maxim, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," *Shelton v. Tucker*, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960), holds especially true with respect to the protection of the First Amendment within law schools at State universities. Thus, excessive regulation of the speech of faculty members may actually impair the ability of a law school to function efficiently. Therefore, in striking a balance between the interests of a law professor commenting as a citizen upon issues of public concern and the interests of a State in providing the efficient provision of services by a law school, courts should seek to protect the First Amendment principles that underlie both a citizen's interest in free speech and a law school's underlying mission.

### a. Blum's Speech

It appears that the bulk of Blum's speech was protected speech under the First Amendment. In classes and in campus publications, Blum advocated the legalization of marijuana and criticized national drug control policy. For example, Blum "in his [F]irst [A]mendment class . . . set a number of hypotheticals in the context of the current drug war." Blum's Brief at 48.[5] Blum also

---

5. We, of course, express no opinion as to the pedagogical efficacy of such hypotheticals except to caution that politically charged hypotheticals are often confusing. This is true even of the hypothetical set forth in Blum's Brief as an example of non-protected speech under *Connick v. Myers*: "I really hope pot gets legalized so I can become a legitimate millionaire like Joseph Ken-

nedy and someday have my son be elected president of the United States." Blum's Brief at 46. We disagree with Blum's suggestion that such speech would not be protected under the First Amendment, noting the protection traditionally afforded to political satire. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 54–55, 108 S.Ct. 876, 881–82, 99 L.Ed.2d 41 (1988).

published two pieces in a campus publication and participated in a debate regarding civil disobedience. *Blum v. Schlegel,* 830 F.Supp. 712, 717 (W.D.N.Y.1993) (order denying preliminary injunction) ("Order").

■ To be protected under the First Amendment, a State employee's speech must implicate matters of public concern. The Supreme Court has cautioned, however, that not every "matter[ ] which transpire[s] within a [State institution] [is] of public concern." *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691. The district court found that Blum had offered no "specific evidence that these articles or debate touched a matter of public concern." Order at 717. The district court, therefore, found that Blum had failed to meet his burden of establishing that the speech at issue was protected. Blum challenges this finding. Blum's Brief at 46–47.[6]

■ We find that Blum's speech advocating the legalization of marijuana, criticizing national drug control policy, and debating civil disobedience on its face implicates matters of public concern. The most cursory review of this court's docket will reveal that the abuse of and traffic in controlled substances is a major societal problem. The government's approach to this problem is, therefore, a matter of great importance—an incorrect or misguided approach is unlikely to solve the problem. Thus, criticism of the federal government's national drug control policy—even to the extent of advocating the legalization of certain drugs—implicates matters of public concern.

Further, as indicated above, the efficient provision of services by a State university's law school actually depends, to a degree, on the dissemination in public fora of controversial speech implicating matters of public concern. Blum's speech, therefore, does not impair the interests of the state in efficient provision of services through its law school.

It is true that the fact that an employee's speech touches on matters of public concern will not render that speech protected where the employee's motive for the speech is private and personal. The district court found that "[g]iven [Blum's] admitted personal interest in the legalization of marijuana, it appears likely that [Blum] simply was airing his own feelings about drugs and that his motivation for writing the articles was personal." Order at 729. We find the inferential step from personal interest to private motive to be unsupported by what evidence is before us. Virtually every citizen has a personal interest in matters of public concern; after all, each citizen is a member of the public and is, in some way, impacted by the resolution of societal problems. The determinative question is whether that interest arises from the speaker's status as a public citizen or from the speaker's status as a public employee. Had there been evidence that Blum was facing termination for personal consumption of marijuana or evidence that Blum was trying to evade or discredit a drug-testing program, such evidence might have supported the inference that Blum's speech was motivated by his personal interests as a public employee. In the absence of any such evidence, however, we find that the district court's determination that Blum's speech was not protected even if it implicated matters of public concern to be erroneous.

### b. Adverse Employment Action

■ Blum argues that he suffered an adverse employment action in that he was denied tenure review. Blum's Brief at 47–48. Defendants, however, argue that there was no adverse employment action. Rather, they contend, Blum simply waived his right of tenure review. Defendants' Brief at 15. The district court found that Blum initially consented to postponing his tenure review and subsequently withdrew entirely from tenure review. Order at 730. We have already summarized the extensive correspondence between Blum and Law School Dean Filvaroff concerning deferment of tenure and promotion review until the Fall of 1991.

---

**6.** Blum does not appear to challenge the District Court's determination that Blum's private interest in the substance of various letters concerning his promotion and tenure as well as suggestions relating to school policies and curriculum precludes a finding that the letters were protected speech under the First Amendment. Accordingly, we do not review this aspect of the District Court's order.

There is ample evidence within this correspondence that Law School officials sought to comply with Blum's desire to defer tenure and promotion review until the Fall of 1991. Blum argues that his consent to this deferment was conditioned upon receipt of "identical appointment papers." Dean Filvaroff's November 16, 1990 letter confirmed that he had no intention of changing the prior understanding to keep Blum on the faculty for an additional year, as stated in the September 13, 1989 letter. The dean informed Blum that "you already have my letter of September 13, 1989," which promised to extend Blum's appointment, without any specification of title, to "the next academic year," *i.e.*, 1991–92, if tenure were not granted in 1990–91. Blum confirmed his understanding of these generalized terms by responding the same day that "we are in accord as to the continuing validity of your September 13, 1989 promise to *extend* my current contract through August 31, 1992." Joint Appendix at 30 (emphasis added). Blum's own correspondence indicates that, initially at least, he continued to expect *tenure and* promotion review to occur simultaneously. *See* Letter of Blum to Filvaroff dated November 29, 1990, Joint Appendix at 34 ("You have indicated a desire to move quickly on setting up a new promotion *and tenure* visiting subcommittee for me") (emphasis added). Furthermore, Blum has cited no direct evidence of any explicit request that his tenure and promotion review proceed in the Spring of 1991 once it became clear to him that he would be appointed "Visiting Associate Professor," rather than "Associate Professor." *See* Blum's Brief at 21–26 (containing no reference or citation to any such explicit request). Thus, the district court's finding that Blum waived sixth-year tenure and promotion review is amply supported by evidence in the record and we cannot conclude that the district court erroneously found that there was no adverse employment action.[7]

### c. Causal Connection

Even assuming that Blum suffered an adverse employment action, the district court found that Blum failed to demonstrate that his speech was a substantial factor in the handling of his tenure and promotion review. Order at 728. Blum challenges this finding, pointing to several statements that, he argues, constitute "direct evidence" that his "tenure difficulties" were related to his utterance of constitutionally protected speech. Blum's Brief at 48. Of these statements, only one statement is by a named defendant. That statement, Blum argues, constitutes:

> direct evidence that displeasure with plaintiff's speech was the source of his tenure difficulties (e.g., Dean Filvaroff's deposition testimony that because President Sample "didn't want any noise in the system" and plaintiff received negative marks in the area of "community or university service" because of his statements about the war on drugs....)

Blum's Brief at 48 (citing Joint Appendix at 502–03). Filvaroff's deposition, however, cannot support such a reading. The relevant portion of the transcript from that deposition speaks for itself:

Q. Are you aware of any negative community service in the sense of things that a professor could do that would get negative points in community service?

A. [FILVAROFF] Well, it is, I think, known to us both that your position statements on drug issues aren't terribly popular with a great many people, are controversial. I'm not troubled by positions taken by faculty as identified by some as controversial or troublesome as counting in terms of, you know, negative, Jeff.

Q. In the eyes of other faculty members, would that count as negative community service?

A. I don't know. I have no idea whether people think of it in those terms. I have never discussed it with them and I would not feel comfortable conjecturing about the views or reactions of others.

---

7. Blum appears to be contending on appeal that his waiver of sixth-year tenure review was conditioned on the dean's giving him the type of fourth-year contract extension that would have had the effect of administratively conferring tenure. If his plan were thus to "put one over" on the dean, we agree with the district court that the record does not contain evidence indicating that this plan ever became part of the agreement between Blum and the dean.

Q. What about members of the Central University Administration?

MR. SULLIVAN: I object to the form.

BY MR. BLUM:

Q. Would that count as negative community service to them?

MR. SULLIVAN: I object to the form.

THE WITNESS [FILVAROFF]: Oh, let me respond this way: Steve Sample did not like noise in the system and, for example, to the extent that there was a great deal of publicity, if you remember, or controversy surrounding recruiting by the military at the law school which attracted notice wholly apart from the merits of—that Steve Sample would, I think, have preferred a university where things went along quietly, smoothly, there were these eruptions.

My view—and I'm not referring to that specific event—and the views of the then Provost and the current President of the University were that controversy, vigorous controversy was an inherent part of the University and intellectual life. If such things did not happen from time to time, there was reason to think maybe not much is going on.

Joint Appendix at 501–502. Far from direct evidence of a causal connection between Blum's speech and his "tenure difficulties," this portion of Filvaroff's deposition constitutes evidence that Blum's speech was not a substantial factor in the handling of Blum's tenure.

Blum also cites as direct evidence of a causal connection "Dean Albert's statements to the law school newspaper that plaintiff was deemed an unsuitable tenure candidate not 'because of his ideas,' but because of his 'outspokenness.'" Blum's Brief at 48 (citing Joint Appendix at 821). Here, too, examination of the record is revealing.[8] The newspaper article states:

Albert explained the difference: He said that it was not Blum's views, it was his outspokenness. It was not the issues that were the problem, according to Albert, "it is the time, place and manner, and logical reasoning, cogency, and willingness to lis-

ten to opponents." In other words, Albert believes that the problem is not Blum's views, but the way he presents them.

Joint Appendix at 821. Like Filvaroff's statements, this account of Albert's statements does not constitute, as Blum contends, direct evidence of a causal connection between Blum's speech and the handling of his tenure and promotion. On the contrary, this account confirms that there was no connection between the content of Blum's speech and any alleged adverse employment action.

Finally, Blum cites "President Greiner's 30 year-old son's defamatory denunciation of plaintiff as 'that horrible Canadian professor who spends half of every class talking about marijuana.'" Blum's Brief at 48. Blum offers no citation to the record to support this statement. Furthermore, even if Blum's account of this statement could be supported by evidence in the record, it constitutes absolutely no evidence of a causal connection between Blum's speech and any allegedly adverse employment action. Thus, even if one were to assume that Blum did not waive sixth-year tenure review, Blum has failed to present any evidence indicating that the decision to defer Blum's tenure review was causally connected to his protected speech.

In view of the fact that Blum offered no direct evidence of a causal connection between his speech and any allegedly adverse employment action and in view of the fact that there is ample evidence, as discussed above, that Blum's tenure and promotion review was deferred until the seventh year at his request and that tenure and promotion review did not occur in the seventh year because he requested that no such review occur, we conclude that the district court correctly determined that Blum had failed to demonstrate a causal connection between his protected speech and the allegedly adverse employment action.

**2. Blum's Fourteenth Amendment Claims**

Blum argues that he has a property interest in timely and non-arbitrary promotion and tenure review. Blum's Brief at 20–38.

---

**8.** We note that Blum has misquoted the article. First, the article uses the words "because of his views" not "because of his ideas." Second, these words are the reporter's, not Albert's.

The district court rejected this argument, finding that the expectation of tenure is not a vested right protected by the Due Process Clause of the Fourteenth Amendment. Order at 720.

 Tenure, once conferred, is a property interest protected by the Due Process Clauses of the Fifth and Fourteenth Amendments. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576–77, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972); *Slochower v. Bd. of Higher Educ.,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956). Whether the *expectation of tenure* is a property interest, however will depend on the facts of a particular case. The Supreme Court, in *Roth,* indicated that any constitutionally cognizable property interest in the expectation of continued employment at an educational institution is "created and defined by the terms of . . . appointment." *Roth,* 408 U.S. at 578, 92 S.Ct. at 2709. In this case, Blum's terms of appointment provided no expectation of continuing appointment. On the contrary, Blum's appointment was expressly limited to two terms totalling six years. We recognize, however, that Blum does not claim that he was unconstitutionally deprived of tenure and promotion. Rather, Blum argues that he was unconstitutionally deprived of the right to timely and non-arbitrary review for tenure. This right exists, Blum argues, by virtue of established procedures governing tenure and promotion review set forth in the University Handbook. Thus, we are faced with the question whether a university employee may have a property interest in the procedures governing tenure and promotion review even though that employee concededly held no property interest in tenure itself.

This question was implicated, but not squarely addressed, by *Dube v. State Univ.* *of New York,* 900 F.2d 587, 599 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991). In *Dube* this court acknowledged "that Dube was entitled to be considered for tenure in accordance with established contractual procedures." *Id.* at 599. Although this court proceeded to cite cases for the proposition that violation of such contractual procedures did not implicate a constitutionally cognizable property interest, this court did not squarely hold that the violation of such procedures did not implicate a constitutionally protected property interest. Instead, this court indicated that the contractual procedures governing Dube's tenure review were complied with. *See id.* at 599 n. 7.

However we might resolve this issue in a case properly presenting it, we need not resolve the issue in this case because the district court found that Blum had waived whatever right he might have had to sixth-year tenure consideration and the record contains evidence that Blum unequivocally declined to be considered for tenure in the seventh year.

 Blum also argues that the actions of Associate Dean Schlegel deprived him of a constitutionally protected liberty interest in his professional reputation. Blum points to Schlegel's deposition for evidence that Schlegel "would have used" the phrases "off the wall," "a bit of a flake," "a flake" in communicating his view of Blum to others.[9] Blum argues that these characterizations amount to "[c]harges of mental illness" that may not be made arbitrarily or capriciously by a State official without offending the Due Process Clause of the Fourteenth Amendment. Blum's Brief at 45.

The characterizations to which Blum objects, however, were offered by Schlegel in

---

9. Blum cites thirty-one pages of transcript in support of this argument.
 While we will not attempt to summarize those pages, a representative exchange is as follows:
 MR. BLUM: . . . Professor Schlegel, do you recall ever making any comments to colleagues to the effect that I was either crazy or viewed as crazy by my colleagues?
 THE WITNESS [SCHLEGEL]: Try one or the other.
 MR. BLUM: Well, first that I was crazy?
 THE WITNESS: No, I would have never have used that word.

 MR. BLUM: What's the word you would have used?
 MR. CREAM [ATTORNEY FOR SCHLEGEL]: Objection as to form.
 THE WITNESS: Off the wall.
 MR. BLUM: Would you have used any other words with regard to me?
 MR. CREAM: Objection as to form.
 THE WITNESS: Stark raving mad.
 Joint Appendix at 734–35.

response to hypothetical questions. Indeed, Schlegel's attorney repeatedly objected to the form of many of Blum's questions on this matter—questions which were often objectionable. At any event, we are presented with no evidence that Schlegel actually communicated such characterizations to others at the Law School. Even if we were presented with such evidence, however, it cannot seriously be maintained that such characterizations constitute "charges of mental illness" that deprived Blum of a liberty interest. It is extremely unlikely that the expressions "a bit of a flake," "off the wall," or even "stark raving mad," uttered by an associate dean with no expertise in clinical psychology, would have been construed by others as charges of mental illness. Only a very literal interpretation of such utterances,[10] would lead one to characterize them as charges of mental illness. Any reasonable interpretation would characterize such utterances as nothing more than instances of *ad hominem* argument that unfortunately sometimes characterize too much discourse.

Because we find that Blum waived whatever constitutionally cognizable property interest he might have had in the procedures governing tenure and promotion review and because we find that Blum failed to establish a violation of a liberty interest in his professional reputation, we conclude that the district court correctly found that Blum failed to established a probability of success on the merits sufficient to warrant the grant of preliminary injunctive relief.

B. Balance of Hardships and Sufficiently Serious Questions Going to the Merits to Make Them a Fair Ground for Litigation

The district court found both that Blum failed to raise "sufficiently serious questions going to the merits to make them fair ground for litigation" and that the balance of hardships tipped in favor of the defendants. Order at 722–23. As discussed above, we have found that Blum failed to demonstrate any possibility of success on the merits, let alone probability. We find, therefore, that the district court correctly determined that Blum failed to raise sufficiently serious questions going to the merits to make them fair ground for litigation. Because a movant for preliminary injunction must demonstrate both sufficiently serious questions going to the merits to make them fair ground for litigation *and* a balance of hardships tipping in his or her favor and because we have upheld the district court's finding with respect to the absence of sufficiently serious questions, it is unnecessary for us to review the district court's determination on the balance of hardships.

III. CONCLUSION

We find that the district court correctly determined that Blum failed to demonstrate a probability of success on the merits of his claims under the First, Fifth and Fourteenth Amendments. Further, we find that the district court correctly determined that Blum failed to raise sufficiently serious questions going to the merits of his First, Fifth and Fourteenth Amendment claims as to make them a fair ground for litigation. Accordingly, we affirm the district court's order denying Blum preliminary injunctive relief.

Order affirmed.

---

**10.** Ironically, Blum attempted to link Schlegel's characterizations with his alleged reputation for literalism:

> Blum: Was the problem [leading to my characterization as "off the wall"] that I was too literal?

> Schlegel: I said that myself. I find you a more than a little too literal. You seem to have a very difficult time with metaphoric speech which is the kind I use almost all of the time, but I can't help that.

Joint Appendix at 741.