In re COMMCO TECHNOLOGY, LLC, a/k/a BroadStream Communications Corporation, Debtor.

Commco Technology, LLC, a/k/a BroadStream Communications Corporation, Plaintiff,

v.

Science Applications International Corporation, d/b/a Telcordia Technologies, Inc. and U.S. Bank, d/b/a U.S. Bank National Association, Defendants.

Bankruptcy No. 0051488 (AHWS).
Adversary No. 00–5161.

United States Bankruptcy Court, D. Connecticut.

Feb. 2, 2001.

James J. Tancredi, Day, Berry & Howard, LLP, Hartford, CT, for plaintiff.

James R. Fogarty, Fogarty, Cohen, Selby & Nemiroff, LLC, Greenwich, CT, for defendant Science Applications International Corp.

William S. Fish, Jr., Tyler, Cooper & Alcorn, LLP, Hartford, CT, for defendant U.S. Bank.

### ORDER ON PRELIMINARY AND PERMANENT INJUNCTIONS

ALAN H.W. SHIFF, Chief Judge.

On December 20, 2000, the debtor-plaintiff, Commco Technology, LLC, a/k/a BroadStream Communications Corporation, filed the instant Amended Verified Complaint, seeking, *inter alia* injunctive relief against both defendants to prohibit payment on a letter of credit issued by the defendant U.S. Bank National Association for the benefit of the defendant Science Applications International Corporation, d/b/a Telcordia Technologies, Inc. ("SAIC"). On January 4, 2001, SAIC filed an answer which included two affirmative defenses. SAIC withdrew the jurisdiction-

al defense,[1] and the trial proceeded on the stipulated issue as stated in the December 27, 2000 Pretrial Order:

> Can Commco sustain its burden of proving SAIC's fraud sufficient for the Court to make the findings required under the Minnesota (and Connecticut) Uniform Commercial Code (revised section 5–109 et seq.)?

## BACKGROUND

On November 24, 1999, BroadStream Communications Corporation ("Broadstream") entered into a Master Agreement with SAIC for the delivery of certain computer software and hardware. *Plaintiff's Exh. A–2.* As part of that agreement, SAIC required Broadstream to obtain an irrevocable standby letter of credit to secure Broadstream's payment obligations. On November 29, 1999, U.S. Bank issued a letter of credit for the benefit of SAIC in the amount of $7,120,000 with an expiration date of May 17, 2000 ("Letter of Credit"). *Plaintiff's Exh. A–4.*

SAIC delivered services under the Master Agreement and billed Broadstream. In March 2000, Broadstream and SAIC began negotiations in an attempt to settle a dispute that arose over outstanding bills. David Abrahamian, SAIC's Vice–President and Todd Eis, Broadstream's Director of Financial Planning and Analysis with Rod Sherwood, its Chief Financial Officer and Senior Vice–President, represented their respective companies. *January 10, 2001 Transcript at 58; January 11, 2001 Transcript at 30.* As of April 2000, the aggregate amount of the outstanding bills was $11.6 million. On June 30, 2000, the parties executed a Settlement Agreement, with a corresponding Promissory Note, in the face amount of $9,020,000. *Plaintiff's Exhs. A–1, A–5.*

On August 22, 2000, Broadstream voted to dissolve, and on August 24, 2000, it sold a substantial number of its FCC licenses to Advanced Radio Telecom ("ART") for 7.5 million shares of restricted ART common stock. *January 10, 2001 Transcript at 19–20.* At the same time, Broadstream formed Commco Technology, LLC for the express purpose of receiving the ART stock as well as any assets and liabilities that were not part of that sale. On October 6, 2000, the Delaware Secretary of State advised Broadstream that its dissolution was effective. According to the testimony of Scott Reardon, Broadstream's Board Chairman, for all material purposes Commco was substituted for and became the same entity as Broadstream. *January 10, 2001 Transcript at 15–16; 28.* The court adopts that designation.

SAIC was not informed that Commco was the successor of Broadstream until December 12, 2000 when Commco instituted a civil action against SAIC and U.S. Bank in the Connecticut Superior Court at Fairfield, seeking, *inter alia,* an injunction prohibiting payment on the Letter of Credit. On that date, Commco also obtained an *ex parte* temporary restraining order to the same effect. On December 18, 2000, Commco (hereafter—plaintiff) commenced this Chapter 11 case.

## DISCUSSION

 It is well settled that a claim "for a preliminary injunction must show '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping

---

1. U.S. Bank filed an answer on January 5, 2001. Its counsel was in attendance at the trial, but the bank did not offer any evidence or examine any of the witnesses.

 SAIC's first affirmative defense alleged that Commco did not have standing to maintain this action because it was not the successor in interest to Broadstream and because it was not authorized by the State of Connecticut to operate a business. On January 10, 2001, Commco received a certificate of authorization from Connecticut's Secretary of the State to operate. *Plaintiff's Exh., G–7.* On January 10, 2001, SAIC withdrew the first affirmative defense. *January 10, 2001 Transcript at 149.*

decidedly toward the party requesting the preliminary relief.'" *Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994), *quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). The standard for a permanent injunction is essentially the same as for a preliminary injunction except that a claimant must actually succeed as to the merits. That is, since the allegations are actually tested by a trial, the claimant must succeed on the merits rather than merely show a likelihood of success on the merits. *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), *citing University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). *See also Ladd v. Thomas,* 14 F.Supp.2d 222, 224. (D.Conn.1998) ("The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that the plaintiff must actually succeed as to the merits.")

*Irreparable Harm*

The plaintiff has conceded that it cannot reorganize, and it intends to liquidate its remaining assets. *January 10, 2001 Transcript* at 34;118. Its principal assets consist of 7.5 million shares of restricted ART common stock, 106 FCC licenses, which will most likely be sold to ART, and $2.2 million. *January 10, 2001 Transcript* at 117–118. It only has one employee, its president, Scott Reardon. There was no persuasive evidence that if the funds held by U.S. Bank as collateral for the Letter of Credit are drawn in favor of SAIC, the plaintiff's efforts to liquidate its remaining licenses and other assets would be irreparably harmed.

*Success on the Merits*

Since the court has found that the plaintiff has not proven any irreparable harm,

no further analysis is necessary to deny its claim for injunctive relief. Nonetheless, the court also finds that the plaintiff has not met its burden of proving SAIC's alleged fraud under Minn.Stat. § 336.5–109 (2000).[2] The statute requires, in relevant part, that:

> If an applicant claims that a required document is forged or materially fraudulent or that honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant, a court of competent jurisdiction may temporarily or permanently enjoin the issuer from honoring a presentation or grant similar relief against the issuer or other persons only if the court finds that:
>
> . . .
>
> (4) on the basis of the information submitted to the court, the applicant is more likely than not to succeed under its claim of forgery or material fraud
>
> . . . .

As noted, SAIC and Broadstream operated under a Master Agreement whereby SAIC would perform services for which Broadstream would be billed. That obligation was partially secured by an irrevocable, $7,120,000 Letter of Credit. A dispute arose as to how much was owed, and on June 30, 2000, the parties executed the Settlement Agreement which redefined Broadstream's obligation to SAIC by, *inter alia,* establishing $9,020,000 as the aggregate amount of the outstanding bills. The parties also executed the Promissory Note in that amount. *Plaintiff's Exhs.* A–1; A–5.

The plaintiff attempted to prove that the Letter of Credit only secured the payment of Broadstream's bills that were outstanding before the execution of the Settlement Agreement and Promissory Note. It argued that since those documents were exe-

---

**2.** Under Connecticut law, unless modified by the terms of a letter of credit, the liability of an issuer for action or omission is governed by the law of the jurisdiction in which the issuer is located. Conn.Gen.Stat. § 42a–5– 116(b) (1999). Here, the issuer, U.S. Bank, is located in Minnesota. There are, however, no significant differences between Minnesota and Connecticut law on this subject.

cuted in accord and satisfaction of the bills, the Letter of Credit was no longer viable, and any presentation for payment would constitute fraud. Although there is some supportive language in the Settlement Agreement, the persuasive and credible evidence warrants a contrary conclusion.

It is clear from the evidence that the plaintiff knew during the settlement negotiations that led to the execution of the Settlement Agreement and the corresponding Promissory Note that the Letter of Credit was intended to remain viable notwithstanding any agreement as to the amount of outstanding bills. That conclusion is supported by the evidence that SAIC rejected Broadstream's attempt to insert, in a proposed draft of the Promissory Note, a clause which would have provided that the Letter of Credit could be presented and honored *only* "in the event that Maker fails to pay this Note in full when due." *Defendant's Exh. 8, Draft of Promissory Note Attachment.* In response, SAIC informed Broadstream that it insisted on the right to "draw on the Letter of Credit, in whole or in part, *at any time.*" *Defendant's Exhs.* 7 and 8 (emphasis added), *June 14, 2000 E–Mail from David Abrahamian to Todd Eis.* David Abrahamian's testimony explained that SAIC could not agree to Broadstream's proposal that SAIC draw on the Letter of Credit only in the event of a default because "it represents SAIC relinquishing a right that we have today with no tangible benefit to doing so." *Defendant's Exh. 8; see also January 11, 2001 Transcript* at 48.

Attorney Fogarty: How would you relinquish that right, the right to payment at any time, if you agreed to what Mr. Eis was proposing?

David Abrahamian: By the addition of that phrase at the beginning of the second sentence, SAIC would not be able to draw upon the Letter of Credit until such time that the promissory note came due and was not fulfilled, not paid upon by Broadstream.

Attorney Fogarty: So the right that you're insisting on here, is the right to call, to draw down a seven million dollar Letter of Credit, even though the promissory note wasn't even due and payable?

Mr. Abrahamian: Correct.

Attorney Fogarty: And that's the right you were telling Mr. Eis: "I want this right" and he agreed to that?

Mr. Abrahamian: Yes.

*January 11, 2001 Transcript* at 48.

Moreover, Todd Eis admitted during his deposition testimony that "the Letter of Credit could be drawn down at any time even, you know, it could be drawn all the way back to ... when [the Settlement Agreement] was signed." *Defendant's Exh.* 25. David Abrahamian also testified that if Broadstream had not agreed to leave intact SAIC's rights to draw on the Letter of Credit, SAIC "would have gone and drawn on the letter of Credit" before its original expiration date. *January 11, 2001 Transcript* at 32–33

On the basis of those negotiations, the parties incorporated into the final Promissory Note SAIC's insistence on being able to draw on the Letter of Credit at any time. In relevant part, the *Security* section of the Promissory Note provides:

This Note is secured in part by U.S. Bank National Association Letter of Credit ... for the account of Broad-Stream Communications Corporation in the amount of USD 7,120,000 ... *Maker acknowledges that Payee may draw on the Letter of Credit, in whole or in part, at any time in order to partially satisfy amounts owed payee pursuant to this Note.*

*Plaintiff's Exh.* A–5 (*emphasis added*).

It is also noteworthy that during the settlement negotiations, i.e., on May 9, 2000, U.S. Bank at Broadstream's request, extended the expiration date of the Letter of Credit to January 15, 2001. The bank charged a $100,000 fee for the extension, $75,000 of which was to be paid immediate-

ly, and the balance to be paid in the Fall of 2000, depending on whether the Letter of Credit was still in place. On May 15, the bank debited $75,320 from Broadstream's account to cover the first payment, and on October 4, 2000, i.e., after the execution of the Settlement Agreement, the remaining $25,000 was debited. *Defendant's Exhs.* 4–5;17. Those payments, particularly the post Settlement Agreement debit, at a time when the plaintiff was in a weakened financial position, is inconsistent with the plaintiff's claim that the Letter of Credit was a nullity.

The conclusion that the plaintiff fully understood and intended the Letter of Credit to remain enforceable is further corroborated by Scott Reardon's October 30, 2000 letter to SAIC which admitted that "SAIC is in a position to call the U.S. Bank Letter of Credit for $7.12 million on October 31, 2000 per our Settlement Agreement."[3] *Defendant's Exh.* 19. It should be noted, however, that at about the same time that the plaintiff's president was giving that assurance to SAIC, i.e., November 10, he sent a letter to U.S. Bank, which was not copied to SAIC, claiming that

> SAIC at Paragraph 2 [of the Settlement Agreement] waived and released any and all claims against Broadstream under the Service Agreement. On the basis of this agreement, any effort by SAIC to draw on the Letter of Credit for sums allegedly due is wrongful and fraudulent.

*Plaintiff's Exh.* E.

For the foregoing reasons, it is concluded that the Letter of Credit is collateral for the Promissory Note which redefined the aggregate amount of the pre-Settlement Agreement unpaid bills. SAIC did not falsely certify to U.S. Bank that SAIC "has performed services for Broadstream Communications Corporation and that billings for those services in the amount of up to and including $7,120,000 have not been

paid by Broadstream Communications Corporation." Therefore, the plaintiff has not shown the requisite fraud that would warrant an injunction.

ACCORDINGLY, the temporary restraining order is vacated. The plaintiff's claim for injunctive relief is denied, judgment in this adversary proceeding shall enter in favor of the defendants, and

IT IS SO ORDERED.

---

**3.** Under the terms of the Promissory Note, Broadstream's obligation became due and payable on October 31, 2000. *Plaintiff's Exh.* A–5.